[Cite as *State ex rel. Harris v. Indus. Comm.*, 2022-Ohio-3149.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Stephen W. Harris, | : | |
| Relator, | : | |
| v. | : | No. 21AP-60 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on September 8, 2022

**On brief:** *Spears & Marinakis, LLC*, and *David R. Spears*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Kevin J. Reis*, for respondent Industrial Commission of Ohio.

**On brief:** *Reminger Co., L.P.A.*, and *Brandon Abshier*, for respondent Southern Ohio Correctional Facility.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, J.

{¶ 1} Relator, Stephen W. Harris, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying relator's application for scheduled loss of vision compensation pursuant to R.C. 4123.57(B), and to enter an order granting said compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to magistrate who issued a decision, including findings of fact and

conclusions of law, which is appended hereto. The magistrate found that Dr. Wareham's report is some evidence upon which the commission could rely in determining that relator's loss of vision was not attributable to damage to the structure or function of relator's eyes proper, but was due to the loss of brain function. Based upon this factual determination, the magistrate found that the commission properly applied *State ex rel. Smith v. Indus. Comm.*, 138 Ohio St.3d 312, 2014-Ohio-513. *Smith* held that R.C. 4123.57(B) does not authorize loss of use compensation when a loss of brain function is the cause of the vision loss rather than damage to the eye structure itself. Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.

{¶ 3} Relator has filed two objections to the magistrate's decision. In his first objection, relator argues that two Supreme Court of Ohio cases decided after *Smith*, *State ex rel. Bowman v. Indus. Comm.*, __ Ohio St.3d __, 2022-Ohio-233, and *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, indicate that *Smith* is no longer controlling law and that loss of use compensation for loss of vision does not require a physical injury to the eye structure itself. Therefore, relator contends that the magistrate erred when he concluded that *Smith* precluded loss of use compensation. We disagree.

{¶ 4} Neither *Bowman* nor *Beyer* involved a loss of vision not attributable to some damage to the eye structure itself. Consequently, neither case cited *Smith* nor discussed whether a claimant could receive a scheduled loss of use compensation for vision loss without some physical injury/damage to the eye structure itself.

{¶ 5} In *Bowman*, the claimant sustained physical injury to his eye structure— cataracts caused by an e-coli infection. *Bowman* did not cite *Smith* nor was it confronted with the issue presented to the court in *Smith*. Rather, the issue in *Bowman* was whether the commission abused its discretion by relying on the part of a physician's report that the physician himself had disclaimed. There is nothing in *Bowman* that undermines the holding in *Smith*.

{¶ 6} Likewise, in *Beyer*, the claimant's loss of vision was attributable to the development of cataracts in both eyes caused by his long-term use of corticosteroids to treat his industrial injury. *Beyer* did not cite *Smith* nor discuss the issue that was before the court in *Smith*. Rather, the issue in *Beyer* was whether a claimant could establish a

percentage of vision actually lost without submitting medical evidence showing the degree of visual impairment. Again, nothing in *Beyer* undercuts the holding in *Smith*.

{¶ 7} Because neither *Bowman* nor *Beyer* indicate that the holding in *Smith* is no longer valid law, we agree with the magistrate that *Smith* is applicable and that R.C. 4123.57(B) does not authorize loss of use compensation when the loss of brain function is the cause of the vision loss rather than actual damage to the eye structure itself. For this reason, we overrule relator's first objection.

{¶ 8} In his second objection, relator contends that the magistrate erred when he concluded that Dr. Wareham's report was some evidence upon which the commission could rely in denying relator's application for scheduled loss of vision compensation. Relator asserts that Dr. Wareham's report is equivocal and/or so internally inconsistent that the contradiction cannot be reconciled. However, relator makes no attempt to explain how or why Dr. Wareham's report is equivocal or internally inconsistent. Instead, relator essentially repeats his argument that *Smith* is no longer controlling law and that Dr. Wareham should not have been given the *Smith* legal standard in formulating his opinion. For the reasons we previously identified in overruling relator's first objection, relator's contention that *Bowman* and *Beyer* have effectively overruled *Smith* is incorrect. Nor has relator articulated any reason why Dr. Wareham's report is equivocal or internally inconsistent. For this reason, we overrule relator's second objection.

{¶ 9} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus denied.*

JAMISON and McGrath, JJ., concur.

———————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Stephen W. Harris,            :

      Relator,                                    :

v.                                                          :                    No. 21AP-60

Industrial Commission of Ohio et al.,      :                    (REGULAR CALENDAR)

      Respondents.                              :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on March 17, 2022

---

*Spears & Marinakis, LLC,* and *David R. Spears,* for relator.

*Dave Yost,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

*Reminger Co., L.P.A.,* and *Brandon Abshier,* for respondent Southern Ohio Correctional Facility.

---

IN MANDAMUS

{¶ 10} Relator, Stephen W. Harris, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders denying relator's application for scheduled loss of vision compensation pursuant to R.C. 4123.57(B), and enter an order granting such compensation.

Findings of Fact:

{¶ 11} 1. Relator suffered injuries on June 4, 2014 in the course of and arising out of his employment with respondent Southern Ohio Correctional Facility where he worked as a correctional officer. (Stip. at 1.) Relator was physically assaulted by an inmate and suffered head and shoulder injuries.

{¶ 12} 2. Relator's claim was allowed for: "Closed head injury; posterior scalp abrasion; contusion right shoulder region; contusion right elbow; lumbar sacral contusion; abrasion jaw; tear right rotator cuff; blurred vision left eye; agoraphobia with panic disorder; post-concussion syndrome; homonymous field defect with left hemianopsia bilateral eyes." (Stip. at 163.)

{¶ 13} 3. Relator was seen by neurologist Marsha Smith, M.D., on July 16, 2014. Dr. Smith, in addition to reviewing relator's other injuries, assessed blurred vision and recommended referral to an ophthalmologist. (Stip. at 21.) Dr. Smith's report noted normal pupils, irises, and optic discs. (Stip. at 20.) She further noted no sign of damage to relator's optic nerves. (Stip. at 20.)

{¶ 14} Relator saw ophthalmologist John D. Evans, M.D., for consultation on July 24, 2014. (Stip. at 26.) Dr. Evans noted relator's complaints of blurry vision and poor left peripheral vision without pre-injury vision problems. Dr. Evans reached an assessment of "subjective visual disturbance related to the left hemianopsia" and "[h]omonymous [b]ilateral [f]ield [d]efects [v]isual [f]ield." (Stip. at 26.)

{¶ 15} Stuart M. Terman, M.D., conducted a file review on behalf of the Ohio Bureau of Workers' Compensation ("BWC") pursuant to relator's motion requesting recognition of his visual conditions. Dr. Terman noted the absence of any pre-existing condition and concluded as follows: "a mechanism of severe head trauma may indeed lead to direct visual blurring, post-concussive syndrome and the homonymous hemianopsia evaluation is an ongoing concern being followed by neurology." (Stip. at 31.)

{¶ 16} Dr. Evans examined relator again on September 5, 2014 noting the results of past neurological examinations and testing. Dr. Evans assessed a complete left hemianopsia and no improvement since the previous visit and no definite brain pathology to account for the vision difficulty. (Stip. at 36.)

{¶ 17} James Ravin, M.D., conducted a physician review of medical records on December 23, 2014 in connection with relator's request for allowance of additional conditions related to his vision deficit. Dr. Ravin noted Dr. Smith's report and summarized it as follows:

> Marsha Smith, M.D., of SOMC Neurology Associates evaluated the worker on 07/16/2014. The review of systems [sic] noted blurred vision, but denied double vision. Eye examination noted an intact acuity right eye, diminished left eye, although no measurements are given. A left homonymous hemianopsia was noted. However, under cranial nerves examination the optic nerves were noted to be intact and the peripheral vision was normal to confrontation."

(Stip. at 44.)

{¶ 18} Dr. Ravin concluded that relator suffered visual field deficits related to his industrial injury: "This worker received a severe head injury which markedly affected his peripheral vision. This has interrupted the fibers that deal with vision to one side and is due to a severe injury on the opposite side of the brain. Such results of severe head injury are noted with some frequency." (Stip. at 47.)

{¶ 19} Dr. Evans re-examined relator on August 18, 2017 and noted progression of the visual field deficit, which appeared to be of neurological origin. (Stip. at 94.) Dr. Evans ordered an MRI of the brain and eyes which was performed on September 5, 2017. (Stip. at. at 109.) The radiology report from this procedure stated as follows:

> Technique:
> Multiplanar, multi sequence images were obtained to the brain and orbits with and without contrast.
>
> * * *
>
> MRI Orbits:
> The globes are symmetric. There is no intraorbital mass. The bilateral optic nerves, optic chiasm, and visualized portions of the optic tracts are unremarkable. No abnormal enhancement identified.

{¶ 20} 4. A commission staff hearing officer ("SHO") granted relator's application for permanent total disability ("PTD") compensation by order mailed November 8, 2019. (Stip. at 163.)

{¶ 21} 5. Shortly before resolution of his PTD application, relator filed his C-86 motion on October 9, 2019 requesting an additional award for scheduled loss of use pursuant to R.C. 4123.57(B) based on a 98 percent bilateral loss of vision. (Stip. at 162.) Relator supported his motion with medical records and reports dating back to his original time of injury. Relator's application was supported by a report prepared by David G. Howard, M.D., at the request of the commission. Dr. Howard assessed the status of the previously allowed conditions of blurred vision left eye, homonymous field defect with left hemianopsia bilateral eyes left, and found a 99 percent visual loss of the left eye. (Stip. at 155.) Dr. Howard then found for relator's right eye homonymous field defect with hemianopsia bilateral right and a 97 percent visual loss. Based on this, Dr. Howard concluded that relator had a 98 percent visual loss in total.

{¶ 22} 6. BWC referred relator for evaluation by Marshall Wareham, M.D., pursuant to the application for scheduled award for loss of vision. The referral contained the following written instructions to the evaluating physician: "R.C. 4123.57 does not permit an award for loss of vision or hearing resulting from the loss of brain functioning. To be entitled to an award for loss of vision or hearing, evidence must demonstrate an actual injury to the eyes or ears. Please review the injured worker's allowed conditions and opine if the loss of use for vision (or hearing) is due to an actual injury to the eyes or if this is due to loss of brain functioning." (Stip. at 168.)

{¶ 23} Dr. Wareham produced a report dated January 2, 2020. (Stip. at 169.) Dr. Wareham reviewed relator's medical history after the injury in relation to the effect on relator's vision. After examination, Dr. Wareham, guided by the commission's instructions regarding the source of vision loss to support a scheduled award, concluded that relator had suffered no percentage of visual acuity loss resulting from actual injury to the eyes:

> Clearly, there was no evidence of injury to the eyes, so there is 0% loss of vision due to actual injury to the eyes. Therefore, there is no visual acuity loss due to the allowed conditions in the claim, as same stem from loss of brain functioning, as opposed to an injury to the eye(s). The loss of visual acuity from non-allowed conditions is 0% in the right eye and 10% in the left eye using Table 2 on p. 8/211 of *AMA Guides to the Evaluation of Permanent Impairment*, *Fourth Edition*, using the post-injury uncorrected vision and going to the next worst line for the left eye, since he only saw half of the 20/25 line.

* * *

As an additional comment, I would note that I think that it is fairly likely that his vision is actually better now than he professes, both visual acuity and peripheral vision. It is extremely unlikely that his vision would go from 20/20 to 20/200 three years after the injury with no evidence of any change in his brain function or eye function. There is no explanation that would make sense that would show his vision suddenly changing from 20/20 to 20/200 three years after the original injury. Also, at a visit nearly a year after the 20/200 vision of August 2017 and July 2018, his vision was 20/60, so his vision seemed to be fluctuating for unexplained reasons, which could be artifactual or not real. He also was shown on the visual field test to have nearly extinguished peripheral vision, and he professed to be unable to count fingers in any quadrant. However, he had no difficulty negotiating into the exam room or down the hallways, which would be unlikely with no peripheral vision. Therefore, I think it is rather unlikely that he has better visual acuity that he appears to have, and his vision is most likely much better than that. It is also unlikely that his peripheral vision is as bad as it has measured, but once again, even if it is, it would not be due to damage or injury to the eyes.

(Stip. at 173.)

{¶ 24} 7. A district hearing officer ("DHO") heard the matter and issued a decision mailed August 8, 2020. (Stip. at 177.) The DHO noted the following facts:

It is the order of the District Hearing Officer that the C-86 Motion filed by the Injured Worker on 10/10/2019 is denied.

The request for a scheduled loss/loss of use – **98% BILATERAL LOSS OF VISION** of the Injured Worker is **DENIED**. The District Hearing Officer finds that the medical evidence on file fails to establish that the Injured Worker has sustained any loss of sight in either eye as a result of this industrial injury based on the report of Marshall Wareham, M.D., dated 01/02/2020.

Dr. Wareham reviewed the Injured Worker's visual examination history and noted the inconsistencies in the results as well as the lack of an explanation for any visual loss. Furthermore, the Injured Worker's performance on Dr. Wareham's visual examination called into question the credibility of the alleged loss of sight. Given the absence of a credible assessment, the District Hearing Officer finds that a

> permanent loss of sight for either of the Injured Worker's eyes has not been established.
>
> The District Hearing Officer notes that the alleged loss of vision in this Injured Worker is not due to a lack of brain stem function and, therefore, Memo F4 of the Adjudications Before the Ohio Industrial Commission is not applicable.

(Emphasis sic.) (Stip. at 176-77.)

{¶ 25} 8. An SHO upheld the DHO's decision with a decision mailed on October 3, 2020. (Stip. at 187.) The SHO's order contained no further discussion of the evidence or applicable law beyond noting that it was based upon the report of Dr. Wareham.

{¶ 26} 9. Relator filed an appeal to the commission from the SHO's order, identifying the following as the reason for the appeal: "The SHO order relied upon a report of Marshall Wareham, MD which is based upon an incorrect legal premise. Dr. Wareham opined the vision loss was not appropriate because it was caused by injury to the brain and not the eyes." (Stip. at 190.) The commission denied the appeal by SHO's order mailed October 22, 2020. (Stip. at 191.)

{¶ 27} 10. Relator moved for reconsideration based upon a clear mistake of law and fact. Reconsideration was premised upon flaws in Dr. Wareham's report, specifically an incorrect premise in that the loss of vision must be related to actual injury to the eyes, rather than a loss of brain functioning. Because Dr. Wareham's opinion was based upon an incorrect instruction from BWC, it could not constitute some evidence upon which the commission could rely in denying a scheduled loss. Relator pointed to the medical evidence in the file indicating that relator had sustained injury to nerve fibers causing the bilateral loss of vision.

{¶ 28} 11. The commission denied reconsideration by order mailed December 8, 2020.

{¶ 29} 12. Relator filed his complaint in mandamus with this court on February 19, 2021.

Discussion and Conclusions of Law:

{¶ 30} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 31} Relator seeks a scheduled award pursuant to R.C. 4123.57(B), which provides specific amounts of compensation for loss of certain appendages or body parts. The claimant bears the burden of showing the requisite loss of use and that the loss of use is permanent. *State ex rel. Carter v. Indus. Comm.*, 10th Dist. No. 09AP-30, 2009-Ohio-5547, ¶ 6. The claimant also bears the burden of showing that a causal relation exists between an allowed condition and subsequent loss of use. *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452, 454 (1993).

{¶ 32} The Supreme Court of Ohio has long held that "loss" of a body part includes not only loss by amputation, but also loss of use. *State ex rel. Walker v. Indus. Comm.*, 58 Ohio St.2d 402 (1979). Under this interpretation, an R.C. 4123.57(B) scheduled award is appropriate if the loss of use of a body part or parts amounts to a loss of functional use "to the same effect and extent as if they had been amputated or otherwise physically removed." *Id.* at 403. Applying the rule in *Walker,* this court held that the injured worker seeking scheduled compensation under R.C. 4123.57(B) "must show that the body part was amputated or that 'the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes.' " *State ex rel. Tichy v. Indus. Comm.,* 10th Dist. 10AP-477, 2011-Ohio-2612, ¶ 6, quoting *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.,* 102 Ohio St.3d 341, 2004-Ohio-3166, ¶ 12.

{¶ 33} The dispute in the present case is not novel: the commission asserts that relator, even if he has suffered severe impairment of his visual sense, has not suffered an injury to his eyes that would support a scheduled loss, but only to his brain. This parallels similar controversies involving loss of use of limbs. In those cases, a loss of use resulting from paralysis caused by a spinal injury supports a scheduled loss, whereas a loss of use caused by a brain injury, such as vegetative state, would not. *See, e.g., State ex rel. Moorehead v. Indus. Comm.,* 112 Ohio St.3d 27, 2006-Ohio-6364 (spinal injury causing complete loss of use of limbs supported award under R.C. 4123.57(B)).

{¶ 34} In the principal case addressed by the parties' briefs here, *State ex rel. Smith v. Indus. Comm.,* 138 Ohio St.3d 312, 2014-Ohio-513, the Supreme Court held that R.C. 4123.57 does not authorize loss-of-use compensation for a loss of brain stem function. The claimant in that case sought compensation for, inter alia, loss of use of his eyes and ears. The court held that the statute "does not, however, provide for compensation for a loss of brain-stem functioning that precludes the claimant from processing and understanding the visual and auditory stimuli that are received by functioning eyes and ears." *Id.* at ¶ 1.

{¶ 35} The commission in the present case relied on Dr. Wareham's report based on Dr. Wareham's personal physical examination of relator's eyes and a review of relator's medical history. Dr. Wareham framed his conclusions pursuant to instructions reflecting the commission's "Memo F4," which directed Dr. Wareham to define his conclusions to specify whether a loss of vision, if present, was attributable to damage to the eyes proper, or to a brain injury that precluded an otherwise normal vision from being received and interpreted by the brain.

{¶ 36} Dr. Wareham's opinion can be summarized with two conclusions: first, Dr. Wareham questioned the degree of visual impairment, particularly loss of peripheral vision, claimed by relator; second, Dr. Wareham concluded that there was no damage to the structure or function of relator's eyes proper, and if relator had suffered a loss of vision, it was due to the loss of brain function. The commission could have relied exclusively on the second conclusion in denying benefits, and the discussion on the merits here will turn only on that question.

{¶ 37} Relator argues that Dr. Wareham's report is internally inconsistent and based on an erroneous and misinterpretation of *Smith* as expressed in the commission's Memo F4. Disregarding the impact of Memo F4, which is not in the record of the matter, exists only by reference of the parties, and does not represent controlling authority to supersede statute or Supreme Court precedent, the pertinent question is whether Dr. Wareham's report and opinion is internally consistent, and whether the conclusions comply with the Supreme Court's distinction clearly expressed in *Smith* regarding the source of loss for a limb or appendage. The magistrate concludes that Dr. Wareham's report is adequately consistent and constitutes some evidence to support the commission's determination.

{¶ 38} The magistrate does not accept relator's argument that Dr. Wareham's report is unreliable and cannot constitute some evidence because Dr. Wareham was incorrectly advised by the commission that loss of vision could not be the result of brain function, where *Smith* only refers to loss of brain *stem* function, and that it was therefore error for the commission to instruct Dr. Wareham that loss of vision could only be awarded where there was evidence of actual injury to the eyes. To the contrary, the magistrate believes that *Smith* expressly and inescapably stands for this proposition. The question in the present case, then, is whether an injury to the eye structure can be discerned from the record, and ultimately excluded based on Dr. Wareham's opinion. Dr. Ravin's report of December 3, 2014 reviewed the records of examining physicians and expressly stated that relator had suffered injuries to "fibers that deal with vision." (Stip. at 47.) However, the same report noted that the optic nerves were intact. The note regarding damage to nerve fibers, therefore, cannot refer to the structure of the eye proper, and is concerned with more remote injury to the brain. The subsequent MRI ordered by Dr. Evans similarly noted no damage to the eyes or optic nerves. Neither Dr. Evans nor Dr. Ravin has diagnosed an injury to the eye structure, and Dr. Wareham in his examination and record review could reasonably exclude such an injury.

{¶ 39} It is therefore the decision and recommendation of the magistrate that the requested writ be denied because relator has not established an abuse of discretion by the commission in determining that relator has not suffered a loss of vision that supports an award under R.C. 4123.57(B).

/S/ MAGISTRATE
MARTIN L. DAVIS

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).