[Cite as *State ex rel. Walters v. Indus. Comm.*, 2022-Ohio-4587.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel.                                              :
Laurie M. Walters (Surviving Spouse)
Timothy E. Walters (Deceased),                            :

       Relator,                                            :                    No. 20AP-560

v.                                                        :                    (REGULAR CALENDAR)

Industrial Commission of Ohio et al.,                     :

       Respondents.                                        :

D E C I S I O N

Rendered on December 20, 2022

**On brief:** *Philip J. Gauer, Attorney at Law, LLC*, and *Philip J. Gauer*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Cindy Albrecht*, for respondent Industrial Commission of Ohio.

**On brief:** *Critchfield, Critchfield & Johnston, LTD.*, and *Kimberly L. Hall*, for respondent Paradise Lawn Care, Inc.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

McGRATH, J.

{¶ 1} Laurie M. Walters ("relator"), surviving spouse of Timothy E. Walters ("decedent"), has filed an original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that denied relator's request for payment of a scheduled loss of use award for the loss of two arms, two legs, loss of sight in two eyes, and for the permanent and total loss of hearing in two ears.

{¶ 2} On May 16, 2018, decedent was employed as a mechanic with Paradise Lawn Care, Inc. ("Paradise"). Decedent had been working on a small bucket loader that was used to load mulch onto company trucks. That day, the bucket loader apparently experienced some type of hydraulic leak. Decedent drove the bucket loader to an area behind the shop building to make repairs. Bart Morr, the owner of Paradise, observed decedent working on the bucket loader but proceeded inside the office to conduct other business. Another employee notified Morr that decedent was pinned under the bucket loader and was unconscious. Morr immediately called 911 and went to help decedent. Morr located a large bucket loader with a backhoe attachment and used that vehicle to lift the small bucket loader off decedent.

{¶ 3} Decedent was unconscious and unresponsive. It appears that the bucket loader moved from its upright position toward the ground, landing on decedent's chest and pinning him to the ground. Decedent was under the bucket loader for approximately 10 to 15 minutes. When EMS arrived, decedent had no pulse. EMS started CPR, and intubated decedent at the scene and he was life-flighted to Akron City Hospital. "On arrival [decedent] was unresponsive and intubated, pupils were fixed and dilated." (Stip. at 15.)

{¶ 4} Upon arrival at Akron City Hospital, the neuro critical care initial evaluation noted the "return of spontaneous circulation after seven rounds of CPR with 'down time during CPR 45 minutes.' " (Stip. at 165.) Neither EMS staff, Life Flight staff, nor the emergency room staff were able to identify any obvious trauma. The attending trauma physician, Nathan Blecker, M.D., indicated "[i]interestingly, he has no obvious injuries (no fractures, no organ injuries)." (Stip. at 72.) Multiple hospital records indicate no evidence of fractures or organ injury. "CT Cervical Spine * * * No fracture or spondylolistheses." (Stip. at 90.) "CT Cervical Spine WO Contrast * * * Cervical vertebrae, disc spaces and joints: No fracture, subluxation or other malalignment. * * * [s]urrounding soft tissues of the neck are unremarkable * * * [n]o fracture or spondylolistheses." (Stip. at 116-17.) "AP PELVIS * * * there is unremarkable appearance of both hip joints without acute fracture, dislocation, or joint space narrowing." (Stip. at 137.) Dr. Blecker—"No obvious injuries identified.") (Stip. at 72.) "CT neck: * * * No fracture or spondylolisthesis. * * * CTA Chest: * * * No evidence of aortic dissection or laceration. * * * CT Abd/Pelvis: * * * No

pneumoperitoneum or injury to the solid abdominal pelvic organs." (Stip. at 76-77.) Dr. Blecker indicated that "[t]he etiology of his arrest is either blunt cardiac trauma, or a respiratory arrest (likely from weight of object) that led to a cardiac arrest." (Stip. at 72.)

{¶ 5} Decedent was admitted to the ICU with diagnoses of traumatic cardiac arrest, left pneumothorax, acute respiratory failure with hypoxia, shock, anoxic brain injury, and blunt injury to chest. The primary survey revealed a GCS of 3 (Glasgow Coma Scale which indicates no neurological function) with pupils fixed at 4 mm and unreactive, no spontaneous movement of hands or toes, no grasp, no plantarflexion, and complete loss of consciousness. On May 17, 2018, decedent died as a result of his injuries. Dr. Blecker indicated that decedent "sustained a traumatic cardiac arrest as a result of traumatic asphyxiation as per the Medical Examiner's report. Although he was initially successfully resuscitated, he sustained a severe anoxic brain injury." (Stip. at 7.)

{¶ 6} Relator filed a C-86 motion for a scheduled loss of use award. A hearing was held before a district hearing officer ("DHO") and, in an order dated July 25, 2019, the DHO granted relator's C-86 motion. The Bureau of Workers' Compensation ("BWC") and Paradise appealed.

{¶ 7} A hearing was held before a Staff Hearing Officer ("SHO"), and in a September 6, 2019 order, the SHO vacated the DHO's order and denied relator's C-86 motion. The SHO found, in part, that the medical evidence does not substantiate that these awards are warranted where, as a result of this anoxic brain injury, decedent was left without function of his arms and legs and without the ability to hear or see. The SHO, citing in support *State ex rel. Smith v. Indus. Comm.*, 138 Ohio St.3d 312, 2014-Ohio-513, further held that this type of injury does not satisfy the requirements for the requested loss of use award as the losses of function due to a brain injury do not qualify for the losses enumerated in R.C. 4123.57(B).

{¶ 8} On December 1, 2020, relator filed a complaint for a writ of mandamus requesting that this court order the commission to grant her motion for loss of use award. Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate found the instant matter falls under the

purview of *Smith* and that, without specific guidance, the magistrate was unwilling to allow the loss of use of arms and legs due only to anoxic brain injury when the Supreme Court of Ohio has not allowed the loss of use of eyes and ears due only to anoxic brain injury. Therefore, the magistrate recommended this court deny relator's request for a writ of mandamus.

{¶ 9} Relator raises the following five objections to the magistrate's decision: (1) the magistrate erroneously construed R.C. 4123.57(B) as prohibiting a compensation award for loss of use of arms and legs when the loss results from anoxic brain injury; (2) the magistrate erred in concluding there is no evidence that decedent's legs and arms were not functionable; (3) the magistrate's decision misapplies Ohio precedent on loss of use claim for arms and legs; (4) the magistrate erroneously found that no visual or auditory test could be performed on decedent; and (5) the magistrate erred in concluding that Dr. Blecker's report provides some evidence of functioning eyes and ears.

{¶ 10} In considering objections to a magistrate's decision, we must independently review the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 11} A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given the evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 12} Here, the commission was presented with reports from various physicians, and the commission was clearly within its discretion to judge the credibility of those

witnesses and weigh the evidence. The magistrate found that Dr. Blecker's report constituted some evidence upon which the commission could rely in determining that decedent's loss of vision and hearing was not attributable to damage to the structure or function of his eyes and ears proper, but instead was due to the loss of brain function. Dr. Blecker's letter of March 21, 2019, stated in part: "[B]y the very nature of an anoxic brain injury, [decedent] was * * * likely without function of his vision and hearing until the time of his death." (Stip. at 7.) Based on this factual determination, the magistrate found the commission properly applied *Smith*, which held that R.C. 4123.57(B) does not authorize loss of use compensation when a loss of brain function is the cause of the vision or hearing loss rather than damage to the eye or ear structure itself. *See also State ex rel. Harris v. Indus. Comm.*, 10th Dist. No. 21AP-60, 2022-Ohio-3149; *State ex rel. Dobson v. Indus. Comm.*, 10th Dist. No. 21AP-83, 2022-Ohio-3796.

{¶ 13} As to relator's fourth objection, i.e., that the magistrate erroneously found that no visual or auditory test could be performed on decedent, we again look at the facts of the instant case. The record indicates decedent was at all times unconscious and listed as in a coma with no neurological functions. Under the facts of *Smith*, Dr. Hess could not identify any injury or actual damage to Smith's eyes or ears, and admitted "that there is no test that can show whether Smith's ears actually function, and thus, his *belief* that Smith cannot hear is speculative." (Emphasis sic.) *Smith* at ¶ 17. The Supreme Court observed "there is apparently no test that can be performed to establish definitively whether Smith has an actual loss of sight in one or both eyes or an actual loss of hearing in one or both ears." *Id*. at ¶ 18.

{¶ 14} In the instant case, Dr. Avrom D. Epstein indicated "it was not possible to perform tests of brain function, either in the ambulance or at the hospital. Intractable metabolic derangements precluded testing for irreversible loss of brain function, even after respiratory and circulatory supports were established." (Stip. at 36.) Based on the facts and evidence of this case, we do not find error with the magistrate's determination that no visual or auditory tests could be performed on decedent.

{¶ 15} Since the commission relied upon Dr. Blecker's medical report, and not the opinions of Drs. Epstein and Alexander Merkler (found to be speculative by the

commission), the magistrate, having found that the commission did rely on some evidence to support their findings, properly determined the factual issues and applied the appropriate law. Accordingly, we find no merit to relator's fourth and fifth objections and overrule them.

{¶ 16} We next address relator's first three objections, pertaining to the request for loss of use of decedent's arms and legs. On this issue, the magistrate found that "[a]lthough the court in *Smith* only addressed loss of use of the eyes and ears, without specific guidance, the magistrate is unwilling to allow the loss of use of arms and legs due to anoxic brain injury when the Ohio Supreme Court has not allowed the loss of use of eyes and ears due to anoxic brain injury, and specifically held in *Smith* that the General Assembly has not included loss of brainstem functioning in the schedule for compensation set forth in R.C. 4123.57." (Appended Mag. Decision at ¶ 45.)

{¶ 17} We initially note the Supreme Court in *Smith* was never asked to decide the issue of Smith's loss of use claim for his arms or legs. Specifically, although Smith did submit a claim for the loss of use compensation for his arms and legs, that issue was resolved prior to the matter being heard before the Supreme Court and therefore was not presented to that court for determination. Rather, the issue before the Supreme Court in *Smith* was "whether R.C. 4123.57(B) permits an award of compensation for the scheduled loss of vision or hearing when the inability to comprehend sights or sounds results from a lack of brain-stem function." *Id*. at ¶ 12.

{¶ 18} In the instant matter, neither EMS staff, Life Flight staff, the emergency room staff, nor the physicians at the hospital were able to identify any obvious trauma to decedent. Decedent had no fractures to his body, no injury to any of his organs, and no injury to his arms or legs. According to Dr. Blecker, decedent "sustained a traumatic cardiac arrest as a result of traumatic asphyxiation as per the Medical Examiner's report. Although he was initially successfully resuscitated, he sustained a severe anoxic brain injury." Further, "by the very nature of an anoxic brain injury, [decedent] was certainly left without the function of his arms and legs, * * * until the time of his death." (Stip. at 7.) Based upon this factual determination, the magistrate found that the commission properly applied *Smith* as it also relates to decedent's upper and lower extremities.

{¶ 19} In *Smith*, the Supreme Court concluded that R.C. 4123.57(B) does not authorize loss of use compensation when a loss of brain function is the cause of the vision or hearing loss rather than damage to the eye or ear structure itself, as the General Assembly has not included loss of brain stem functioning "in the schedule for compensation set forth in R.C. 4123.57." *Smith* at ¶ 19. This court now finds that R.C. 4123.57(B) does not authorize loss of use compensation when a loss of brain function is the only cause of the loss of use of an arm or arms and/or a leg or legs rather than damage to the structure of one or both arms and/or one or both legs.

{¶ 20} This court recognizes that there is a line of cases that do award loss of use injury compensation for the loss of vision or hearing. *See, e.g., State ex rel. Autozone, Inc. v. Indus. Comm.*, 10th Dist. No. 05AP-634, 2006-Ohio-2959 (employee perforated one eye with a screwdriver while installing a wiper blade on a car); *State ex rel. Kincaid v. Allen Refractories Co.*, 114 Ohio St.3d 129, 2007-Ohio-3758, ¶ 2 (employee sustained severe facial trauma and a concussion at work resulting from a "fractured left cheekbone; lacerated left cheek; cerebral concussion; scintillating scintellens (periodic loss of bilateral vision)"); *State ex rel. Sheller-Globe Corp. v. Indus. Comm.*, 66 Ohio St.2d 51, 52 (1981) (all parties accept that employee "has suffered at least a profound hearing loss," i.e., between 87 and 100 percent hearing loss). Each of those cases, however, involved injuries to the eyes or ears, not just the loss of brain function, and in none of those cases was an injured worker awarded compensation for the inability of the brain to process visual or auditory signals caused by a loss of brain function.

{¶ 21} There is also a line of cases where loss of use compensation was awarded for loss of use of extremities (arms and/or legs). *See State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364 (worker fell 15 to 20 feet head first onto concrete floor suffering a spinal cord injury which rendered him a quadriplegic); *State ex rel. Arberia L.L.C. v. Indus. Comm.*, 10th Dist. No. 13AP-1024, 2014-Ohio-5351, ¶ 4 (Decedent died after falling about 30 feet from a roof onto his head; when approached, "[b]lood and brain matter were coming from his nose," decedent "was suffering from massive hemorrhages of his brain," and "[h]e also was found to have multiple skull fractures."). Both of these cases involved spinal/neck injuries, in addition to brain injury, i.e., they did not involve an award

of compensation where the only damage to the body was a loss of brain function.  Based upon the foregoing, we find no merit to relator's first, second or third objections.

{¶ 22}  Recognizing that there is importance for clarity and consistency, this court finds the Supreme Court's decision in *Smith* instructive.  Accordingly, where there is only a loss of brain function (i.e., as in the instant case in which decedent suffered a traumatic cardiac arrest as a result of traumatic asphyxiation, sustaining a severe anoxic brain injury), and no injury to a body part listed in R.C. 4123.57(B), and no other injury to the body, the commission does not abuse its discretion in failing to award loss of use compensation under R.C. 4123.57.

{¶ 23}  Following an independent review of this matter, we find the magistrate has properly determined the facts and applied the appropriate law.  Therefore, having overruled relator's five objections to the magistrate's decision, we adopt the magistrate's decision as our own.  In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Objections overruled;*
*writ of mandamus denied.*

BEATTY BLUNT and MENTEL, JJ., concur.

_____

[Cite as *State ex rel. Walters v. Indus. Comm.*, 2022-Ohio-4587.]

APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel.<br>Laurie M. Walters (Surviving Spouse)<br>Timothy E. Walters (Deceased), | : | |
| | : | |
| Relator, | : | |
| v. | : | No. 20AP-560 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on April 6, 2022

*Philip J. Gauer*, *Atty At Law, LLC,* and *Philip J. Gauer*, for relator.

*Dave Yost,* Attorney General, and *Cindy Albrecht,* for respondent Industrial Commission of Ohio.

*Critchfield, Critchfield & Johnston, LTD*., and *Kimberly L. Hall,* for respondent Paradise Lawn Care, Inc.

IN MANDAMUS

{¶ 24} Relator Laurie M. Walters (surviving spouse) ("claimant") and Timothy E. Walters (deceased) ("decedent") have filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order that denied claimant's request for payment of a scheduled loss award for loss of use of two arms and two legs, loss of sight in two eyes, and loss of hearing in two ears pursuant to R.C. 4123.57(B), and to enter an order granting such compensation.

Findings of Fact:

{¶ 25} 1. The decedent was injured on May 16, 2018, in the course of and arising from his employment with Paradise Lawn Care, Inc. ("employer") when a bucket loader pinned decedent under the bucket. The decedent died on May 17, 2018, approximately 24 hours after his injuries occurred. Claimant applied for death benefits and funeral expenses, which the Ohio Bureau of Workers' Compensation ("BWC") approved on September 5, 2018.

{¶ 26} 2. On March 21, 2019, Nathan R. Blecker, M.D., issued a letter, in which Dr. Blecker indicated the following: (1) he was the attending trauma surgeon, as well as the surgical intensivist, who helped take care of decedent until the time of his death; (2) decedent sustained a traumatic cardiac arrest as a result of traumatic asphyxiation as per the medical examiner's report; (3) although he was initially successfully resuscitated, he sustained a severe anoxic brain injury; and (4) in his medical opinion, by the very nature of an anoxic brain injury, decedent was certainly left without function of his arms and legs and likely without the function of his vision and hearing until the time of his death.

{¶ 27} 3. On May 13, 2019, claimant filed a C-86 motion for a scheduled loss of use award, pursuant to R.C. 4123.57(B), for decedent's loss of use of both arms and both legs, for the loss of sight in both eyes, and for the permanent and total loss of hearing in both ears during the time between his accident and his death due to his injuries.

{¶ 28} 4. In a June 6, 2019, letter, the BWC recommended that the C-86 motion be denied and referred the claim to the commission.

{¶ 29} 5. On July 5, 2019, Avrom D. Epstein, M.D., issued a report, in which he indicated the following: (1) in his opinion, decedent suffered a total loss of vision and hearing as a consequence of his traumatic injuries and prolonged anoxia; (2) the primary visual sensory system begins with the retina of the eyes and ends in the rearmost portion of the brain, where seeing actually begins; (3) the retina is composed of nerve cells that derive directly from the brain early in gestation; (4) the prolonged period of anoxia that led to decedent's death also damaged the nerve cells composing the entire visual pathway, resulting in total loss of vision in both eyes; and (5) the prolonged anoxia similarly damaged the nerve cells composing the auditory pathways, resulting in total loss of hearing in both ears.

{¶ 30} 6. A hearing was held before a district hearing officer ("DHO") and, in a July 25, 2019, order, the DHO granted claimant's C-86 motion, finding the following: (1) based on Dr. Blecker's March 21, 2019, report, decedent sustained traumatic cardiac arrest as a result of traumatic asphyxiation, decedent was initially successfully resuscitated but sustained a severe anoxic brain injury, and by the very nature of an anoxic brain injury decedent lost all function of the use of his bilateral arms, bilateral legs, bilateral vision, and bilateral hearing until he died; and (2) based on the total loss of use of both arms, loss of both legs, loss of bilateral eyes, and permanent and total loss of hearing, claimant is entitled to a total loss of use of 1,225 weeks. The BWC and the employer appealed.

{¶ 31} 7. On September 2, 2019, Dr. Epstein issued an addendum, in which he indicated the following: (1) in this case, it was not possible to perform tests of brain function, either in the ambulance or at the hospital; (2) intractable metabolic derangements precluded testing for irreversible loss of brain function, even after respiratory and circulatory supports were established; (3) the primary visual areas of the brain are subject to damage by low blood flow and low oxygen, as are the visual and auditory association areas in the parietal lobes; (4) metabolic abnormalities from the injury limited conclusions from the clinical neurological exam, and the brain was not examined by autopsy; and (5) based on the visual and auditory findings in the medical record prior to his death, decedent spent the last day of his life without hearing or vision.

{¶ 32} 8. On September 2, 2019, Alexander Merkler, M.D., issued a report, in which he indicated the following: (1) decedent experienced severe hypoxic-ischemic injury as a result of likely asphyxiation; (2) hypoxic-ischemic injury preferentially injures structures that are highly metabolically active; (3) hypoxic-ischemic injury affects areas of the cerebrum including the basal ganglia, cortical ribbon, hippocampi, cerebellum, and parietal and occipital lobes; (4) these areas lead to loss of strength, loss of higher cortical functions, such as cognition and language, anterograde amnesia, loss of balance, and loss of sight; (5) in his opinion, these structures in the cerebrum were injured prior to any injury to the brainstem; (6) although decedent experienced severe hypoxic-ischemic injury as a result of asphyxiation, there is no evidence that decedent was ever brain dead; (7) decedent never underwent the required apnea testing or a confirmatory neuroimaging study to confirm brain death and, thus, he was never brain dead; (8) decedent was alive until 8:47 a.m. on

May 17, 2016, when supportive medical care was withdrawn; and (9) until the point of death, decedent had lost the use of his eyes, ears, arms, and legs as a result of the injury suffered in the workplace.

{¶ 33} 9. A hearing was held before a staff hearing officer ("SHO"), and in a September 6, 2019, order, the SHO vacated the DHO's order and denied claimant's C-86 motion, finding the following: (1) the medical evidence does not substantiate that these awards are warranted in this claim; (2) the March 21, 2019, report of Dr. Blecker indicated that, as a result of this anoxic brain injury, decedent was left without functions of his arms and legs and without the ability to hear or see; (3) this type of injury does not satisfy the requirements for the requested loss of use awards; (4) pursuant to *State ex rel. Smith v. Indus. Comm.*, 138 Ohio St.3d 312, 2014-Ohio-513, losses of function due to a brain injury do not qualify for the losses enumerated in R.C. 4123.57(B); (5) the Supreme Court of Ohio expressly indicated in *Smith* that the General Assembly did not include losses of use from a brain injury in the schedule set forth in that section; (6) claimant's reliance upon *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364, is misplaced; (7) *Moorehead* involved a spinal cord injury that rendered the worker quadriplegic, which was found to be compensable under R.C. 4123.57(B), regardless of the duration of the worker's survival subsequent to the injury or the worker's cognizance of being injured; and (8) *Moorehead* did not involve a brain injury that interfered with all bodily functions. Claimant appealed.

{¶ 34} 10. On September 25, 2019, the commission refused the appeal.

{¶ 35} 11. On October 8, 2019, claimant filed a request for reconsideration, which the commission denied on November 7, 2019.

{¶ 36} 12. On December 1, 2020, claimant filed a complaint for writ of mandamus, requesting that this court order the commission to grant his motion for loss of use award.

Conclusions of Law and Discussion:

{¶ 37} The magistrate recommends that this court deny claimant's request for a writ of mandamus.

{¶ 38} In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 39} A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 40} R.C. 4123.57(B) authorizes scheduled compensation to a claimant for the total loss of a body part, such as the total loss of an arm or leg. "Loss" within the meaning of the statute includes not only amputation, but also the loss of use of the affected body part. *State ex rel. Wyrick v. Indus. Comm.*, 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10, citing *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364. An injured worker claiming loss of use under R.C. 4123.57(B) bears the burden of showing that the loss of use is complete and permanent. *State ex rel. Carter v. Indus. Comm.*, 10th Dist. No. 09AP-30, 2009-Ohio-5547.

{¶ 41} In the present case, claimant first argues that the commission abused its discretion in applying *Smith* to deny the scheduled loss of use award for arms and legs. Claimant contends that R.C. 4123.57(B) provides compensation shall be payable for the loss of an arm and a leg, and the statute does not exclude compensation for loss of use of an arm or leg when the loss arises from hypoxic brain injury. Claimant points out that the plaintiff in *Smith* received a loss of use award for arms and legs, and the mechanism of injury has never been a factor to determine whether a loss of use award is appropriate for the loss of an arm or leg. Claimant also points out that in *Moorehead*, compensation was payable even though the loss of use was only for 90 minutes after a head-first fall onto concrete. Claimant

asserts the SHO here wrongly distinguished *Moorehead* on the basis that *Moorehead* did not involve a brain injury that interfered with all bodily functions but instead involved a spinal cord injury, because nothing in *Moorehead* indicated there was no brain injury, and it was not germane to the court's decision whether the injured worker suffered a spinal cord or brain injury. Claimant contends that our decision in *State ex rel. Arberia, L.L.C. v. Indus. Comm.*, 10th Dist. No. 13AP-1024, 2014-Ohio-5351, undermines the SHO's reasoning that the presence of a brain injury precludes compensation for a loss of use award, because that worker in that case had blood and brain matter oozing from his nose and massive hemorrhages of his brain with multiple skull fractures, and this court acknowledged the worker had head and spine injuries, yet this court still found there was a scheduled loss of use for the arms and legs. Claimant also notes that the commission's own agency memo regarding *Smith*, Memo F4, indicates that R.C. 4123.57(B) does not permit an award for loss of vision or hearing resulting from the loss of brainstem functioning and evidence must demonstrate an actual loss of function of the eyes or ears, but the memo does not extend *Smith* to scheduled awards for loss of use of arms and legs resulting from hypoxic brain injury.

{¶ 42} In *Smith*, the worker suffered anoxic brain damage resulting from complications of surgery following a work-related injury. The court noted, without explanation, that the worker was previously granted an award for the loss of use of his arms and legs. However, with regard to his claim for loss of use of his eyes and ears, the court found that no tests could be performed to determine whether he had suffered an actual loss of sight in one or both eyes or an actual loss of hearing in one or both ears, but the medical evidence showed that the worker was unable to process sights and sounds because of damage to his brain, not because of any injury to his eyes. The medical evidence showed that the worker lacked the ability to process visual and auditory stimuli because there was no relay of the impulses past the brain stem to the visual cortex on either side and because there was a loss of efferent pathways from the mid brain and auditory nerve to the auditory cortex. In other words, the worker's eyes and ears were not damaged and could still function, but the signals the eyes and ears received could not be processed by his brain. The Supreme Court found that the General Assembly has not included loss of brainstem

functioning in the schedule for compensation set forth in R.C. 4123.57, and the commission properly denied the claim for loss of use of his eyes and ears.

{¶ 43} After the original briefing in this matter, the magistrate permitted claimant to file a supplement, commission member order in claim number 15-850034, decided August 30, 2018, and the parties submitted additional briefing. In that case, the worker was involved in a trench cave-in, and he died two days later. The worker's dependents filed a request for loss of use award for both arms and both legs. The medical evidence showed that the worker sustained permanent and total loss of use of all four extremities as a result of his anoxic brain damage. The commission found the worker sustained a loss of use of his upper and lower extremities, and *Smith* was factually different than the instant claim and did not dictate a contrary result. The commission indicated that, in *Smith*, the injured worker had already been granted scheduled-loss awards for loss of use of both arms and both legs prior to an additional scheduled-loss request for loss of use of both eyes and both ears. Claimant, in the present case, urges that the commission's determination in claim number 15-850034 establishes that *Smith* does not preclude a scheduled loss award for loss of use of the arms and legs resulting from an anoxic brain injury. Claimant concedes that the order in claim number 15-850034 is not binding precedent.

{¶ 44} The commission counters that the order in claim number 15-850034 does not explain in what manner *Smith* was misapplied by the hearing officer, makes no pronouncement that *Smith* does not preclude a loss of use award for the extremities when there is an anoxic brain injury, and states only that *Smith* and the case under consideration are factually different. The commission claims that the conclusion that *Smith* does not dictate a contrary result is based solely on the fact that the *Smith* court did not consider loss of use of extremities and only addressed compensation for loss of vision and hearing and, therefore, did not address the appropriateness of compensation for the loss of use of the extremities. The commission asserts that the limited recitation of facts and unexplained inapplicability of *Smith* does not allow for a sufficient comparison of the cases or for using the order in claim number 15-850034 as precedent.

{¶ 45} After a review of the authorities cited by both parties, the magistrate finds that the present circumstances fall under the purview of *Smith*. Initially, *Smith* did not address the loss of use of arms and legs, and the court in *Smith* did not explain why the

commission granted an award for loss of use of arms and legs in that case. Although the court in *Smith* only addressed loss of use of the eyes and ears, without specific guidance, the magistrate is unwilling to allow the loss of use of arms and legs due to anoxic brain injury when the Ohio Supreme Court has not allowed the loss of use of eyes and ears due to anoxic brain injury, and specifically held in *Smith* that the General Assembly has not included loss of brainstem functioning in the schedule for compensation set forth in R.C. 4123.57. As with the worker's eyes and ears in *Smith*, in the present case, there is no evidence that decedent's legs and arms were not functionable. Instead, Dr. Blecker's March 21, 2019, report, as relied on by the commission, showed that decedent was left without function of his arms and legs due to anoxic brain injury. As for claim number 15-850034, the magistrate declines to follow it as precedent in the present case, given the few facts stated and failure to explain the inapplicability of *Smith* to those facts.

{¶ 46} Furthermore, the magistrate finds *Moorehead* and *Arberia* distinguishable, as those loss-of-use cases also concerned spinal injuries, and not solely brain injuries, as in the present case. However, the magistrate notes that, although *Moorehead* only specifically mentioned spinal cord injuries as the cause of the loss of use of the worker's arms and legs, in *Arberia*, the case does not make clear whether the brain or spinal cord injuries were responsible for the loss of use of the worker's appendages. The magistrate's decision in *Arberia* states that "[b]ased on the neck fractures, the evidence is undisputed that had decedent been conscious, he could not have used his arms and legs," *Arberia* (magistrate's decision), while the court's decision indicates that the worker in that case "suffered physical injuries to the head" that resulted in the total loss of use of the limbs. *Id*. at ¶ 13. Given the clear indication in *Moorehead*, the lack of clarity in *Arberia*, and the fact that both cases involve a combination of brain and spinal injuries, the magistrate cannot find that either case is directly on point with the current case, and they are not conclusive as to whether there is a compensable loss of use of an appendage when it results from a brain injury.

{¶ 47} Claimant next argues that the commission abused its discretion when it applied *Smith* to deny the scheduled loss of use award for sight and hearing when the losses occurred independent of injury to the brain stem. Claimant asserts that, in *Smith*, the medical evidence showed that the loss of vision occurred because there was no relay of impulses past the brain stem to the visual cortex, and the loss of hearing was due to the loss

of signal from the mid-brain to the nerves that innervate the ears; thus, the worker's inability to process sight and sounds resulted from a loss of brainstem functioning. However, in the present case, claimant contends, Dr. Epstein opined that decedent's loss of sight was due to damaged nerve cells composing the entire visual pathway, and his loss of hearing was damaged nerve cells composing the auditory pathways, both caused by prolonged anoxia, and Dr. Merkler opined that the visual and auditory structures in the cerebrum were injured prior to any injury in the brainstem. Claimant further asserts that the loss of use of sight and hearing cannot be attributed to a brainstem injury because there was no test performed to evaluate brainstem function.

{¶ 48} However, the magistrate finds there was some evidence to support the commission's determination that the loss of use of decedent's eyes and ears is not compensable. Dr. Epstein's and Dr. Merkler's opinions were speculative in nature, given no visual or auditory tests could be performed. Dr. Epstein's opinion that the nerve cells along the auditory and visual pathways were damaged is not supported by any evidence. There was no conclusive evidence from any medical professional that decedent suffered injuries directly to the eyes and ears, and there was no evidence of trauma to the eyes or ears. What is clear from the evidence is that, due to his anoxic brain injury, decedent would not have been able to see or hear. Dr. Blecker's March 21, 2019, letter indicated that, by the very nature of an anoxic brain injury, decedent was likely without the function of his vision and hearing until the time of his death. *Smith* commands that the loss of use of vision and hearing caused by anoxic brain injury that prevents the processing and visual and auditory signals by functioning eyes and ears is not compensable under R.C. 4123.57. Without any conclusive evidence of injury to the organs of the eyes and ears, the commission decided to rely on Dr. Blecker's medical report and not the speculative opinions of Drs. Epstein and Merkler, and the magistrate will not disturb the commission's determinations of credibility and weight, which rest exclusively within the commission's domain. *See Teece*.

{¶ 49} Accordingly, it is the magistrate's decision that this court should deny claimant's petition for writ of mandamus.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).