[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State ex rel. Walters v. Indus. Comm.*, **Slip Opinion No. 2024-Ohio-552.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-552

THE STATE EX REL. WALTERS, SURVIVING SPOUSE, APPELLANT, *v.*

INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State ex rel. Walters v. Indus. Comm.*, **Slip Opinion No. 2024-Ohio-552.**]

*Workers' compensation—R.C. 4123.57(B)—Scheduled-loss compensation—A claimant seeking scheduled-loss compensation under R.C. 4123.57(B) must affirmatively demonstrate with medical evidence the loss for which compensation is sought—Medical evidence demonstrating injured worker did not suffer any injury to his eyes or ears in industrial accident and was unable to participate in definitive visual or auditory testing prior to death due to anoxic brain injury substantiates Industrial Commission's denial of scheduled-loss compensation for loss of sight and hearing—Medical evidence demonstrating injured worker did not suffer any injury to his arms and legs in industrial accident combined with medical opinion that had injured worker recovered from anoxic brain injury he would have recovered*

*use of his arms and legs substantiates commission's denial of scheduled-loss compensation for arms and legs—Court of appeals' judgment affirmed.*

(No. 2023-0024—Submitted December 12, 2023—Decided February 16, 2024.)

APPEAL from the Court of Appeals for Franklin County,

No. 20AP-560, 2022-Ohio-4587.

_____

**Per Curiam.**

{¶ 1} Appellee Industrial Commission of Ohio denied scheduled-loss compensation under R.C. 4123.57(B) to appellant, Laurie M. Walters ("Walters"), the surviving spouse of Timothy E. Walters ("decedent"), who died as the result of an industrial accident. The Tenth District Court of Appeals denied Walters's request for a writ of mandamus ordering the commission to reverse its decision. Walters appealed that decision to this court as of right and filed a motion for oral argument. The issues presented are whether R.C. 4123.57(B) excludes compensation for losses that are due to a brain injury; whether injury to the eyes and ears is required to receive compensation for loss of sight and loss of hearing, respectively, under the statute; whether this court's decision in *State ex rel. Smith v. Indus. Comm.*, 138 Ohio St.3d 312, 2014-Ohio-513, 6 N.E.3d 1142, precludes an award for loss of use of the arms and legs; whether this court's decision in *Smith* should be overruled; and whether some evidence supports the commission's decision to deny Walters scheduled-loss compensation. We deny the motion for oral argument, and we affirm the Tenth District's judgment denying Walters's writ request.

## I. BACKGROUND

{¶ 2} Decedent was employed as a mechanic by appellee Paradise Lawn Care, Inc. ("the employer") on May 16, 2018, when he became pinned under the bucket while repairing a bucket loader, sustaining blunt trauma to his chest. This injury caused traumatic asphyxiation, which in turn caused traumatic cardiac arrest,

ultimately resulting in a severe anoxic brain injury. Decedent never regained consciousness, and he died the following day. The Bureau of Workers' Compensation allowed Walters's application for dependent death benefits.

{¶ 3} Walters also requested a scheduled-loss award under R.C. 4123.57(B), claiming that prior to decedent's death, he suffered the loss of use of both arms and legs, the loss of sight in both eyes, and the permanent and total loss of hearing in both ears.[1] Hospital records indicate that decedent did not sustain any injuries to his arms, legs, eyes, or ears. Walters submitted a letter from Nathan Blecker, M.D., decedent's attending trauma surgeon, in which he opined that "by the very nature of an anoxic brain injury, [decedent] was certainly left without function of his arms and legs, and likely without function of his vision and hearing, until the time of his death the day after he was injured."

{¶ 4} The bureau obtained an independent file review from Thomas E. Lieser, M.D., a board-certified occupational and environmental medicine practitioner. In his report, Dr. Lieser stated that decedent was unresponsive and had no neurologic function "from the moment of the blunt trauma to the moment of his death," that there was no documented evidence of trauma to the extremities, and that there was no indication of compromised vascular or neurologic structures that support the extremities. Dr. Lieser opined, "The objective evidence supports that, had [decedent] recovered from his anoxic brain injury, he would have retained the ability to use the arms and legs." He concluded:

> The absence of use of the arms and legs following the injury reflects the profound level of coma as evidenced by the GCS

---

1. Under R.C. 4123.60, a surviving spouse may apply for an award of compensation for which the decedent would have been lawfully entitled to apply at the time of death. The parties have not contested Walters's ability as a surviving spouse to seek an award under R.C. 4123.57(B) for a loss not caused by severance. *Compare State ex rel. Waste Mgmt. of Ohio v. Indus. Comm.*, 171 Ohio St.3d 68, 2022-Ohio-4581, 215 N.E.3d 512, ¶ 30, fn. 3.

[Glasgow Coma Scale] of 3 consistently documented throughout the post injury period up to and including the moment of death. There is no objective evidence that [decedent] suffered from total loss of use of his extremities. He did not spontaneously move the extremities because of the severe level of coma. Thus, it was not the arms and legs that sustained injury but rather as a result of the posttraumatic cardiopulmonary arrest the brain suffered from significant hypoxic injury causing coma and death, not permanent and total loss of use of the extremities.

{¶ 5} Walters obtained an opinion from Avrom D. Epstein, M.D., a neuro-ophthalmologist who was asked to provide an opinion regarding decedent's loss of sight and hearing following the work accident and his subsequent death. Dr. Epstein reviewed decedent's hospital medical records, the medical examiner's investigative report, and the autopsy report. He opined that decedent had "suffered a total loss of vision and hearing as a consequence of his traumatic injuries and prolonged anoxia." Dr. Epstein noted that "[t]he primary visual sensory system begins with the retina of the eyes and ends in the rearmost portion of the brain, where seeing actually begins. The retina is composed of nerve cells that derive directly from the brain early in gestation." He then explained that in his opinion, "the prolonged period of anoxia that led to [decedent's] death also damaged the nerve cells composing the entire visual pathway, resulting in total loss of vision in both eyes" and the prolonged anoxia "similarly damaged the nerve cells composing the auditory pathways, resulting in total loss of hearing in both ears."

{¶ 6} After a hearing, a district hearing officer ("DHO") for the commission granted Walters's request for scheduled-loss compensation based solely on the opinion of Dr. Blecker. The bureau and the employer both appealed the DHO's order.

4

{¶ 7} While the appeals were pending, the bureau requested from Dr. Lieser an addendum to his original report. The bureau provided Dr. Lieser with the following definition of "death":

An individual is dead if the individual has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain stem, as determined in accordance with accepted medical standards. If the respiratory and circulatory functions of an individual are being artificially sustained, under accepted medical standards a determination that death has occurred is made by a physician by observing and conducting a test to determine that the irreversible cessation of all functions of the brain has occurred.

The bureau then asked Dr. Lieser to review Dr. Epstein's report and, based on the definition of "death" set forth above, provide his opinion whether decedent had suffered "irreversible cessation of all functions of the brain, including the brain stem[,] prior to the loss of use of the extremities, hearing and vision prior to death."

{¶ 8} Dr. Lieser opined:

As noted in my report, [decedent's] lack of responsiveness, the lack of spontaneous movement of the extremities, the lack of response to visual or auditory stimuli was the result of anoxic brain injury, and not the result of direct trauma to the extremities, the organs of hearing or the organs of vision. Ultimately, [decedent] was in a severe coma the entire time leading up to his death, and the absence of use of his extremities, his hearing or his vision reflects the severe degree of coma. The medical evidence clearly supports

that the decedent suffered irreversible cessation of all functions of the brain, including the brain stem, prior to the loss of use of his extremities, his hearing and his vision. There is no documented evidence of spontaneous functioning of the central nervous system immediately following the accident and leading up to his pronouncement of death. Any period of "survival" following the accident was the result of artificially sustained respiratory and circulatory function. Thus, for all intents and purposes, [decedent] was dead prior to the loss of use of his upper and lower extremities, loss of his hearing and loss of his vision, all of which ceased as a result of the severe coma and loss of central nervous system function which occurred irreversibly due to the work incident of 05/16/2018.

{¶ 9} In response, Walters requested Dr. Epstein's opinion regarding Dr. Lieser's addendum to his original report. Dr. Epstein provided the following opinion:

In this case it was not possible to perform tests of brain function, either in the ambulance or at the hospital. Intractable metabolic derangements precluded testing for irreversible loss of brain function, even after respiratory and circulatory supports were established.

The primary visual areas of the brain are subject to damage by low blood flow and low oxygen, as are the visual and auditory association areas in the parietal lobes.

Metabolic abnormalities from the injury limited conclusions from the clinical neurological exam, and the brain was not examined at autopsy. Based on the visual and auditory findings in the medical

record prior to his death on 17 May 2018, it is my opinion that [decedent] spent the last day of his life without hearing or vision.

{¶ 10} Walters also obtained an opinion from neurologist Alexander E. Merkler, M.D., who reviewed the medical and autopsy reports, the other physicians' opinions, and this court's decision in *Smith*. Dr. Merkler opined that "structures in [decedent's] cerebrum were injured prior to any injury in the brainstem," that decedent was "never brain dead" because he never underwent testing to confirm brain death, and that until his death, "[decedent] had lost the use of his eyes, ears, arms, and legs as a result of the [industrial injury]."

{¶ 11} The appeals were heard by a staff hearing officer ("SHO"), who subsequently vacated the DHO's order. The SHO denied Walters's request for scheduled-loss compensation, finding that the medical evidence did not substantiate any such award in this case. The SHO noted Dr. Blecker's indication that decedent had been "left without functions of his arms and legs and without the ability to hear or see" as a result of the anoxic brain injury, but the SHO found, based on this court's decision in *Smith*, that the type of injury decedent sustained "does not satisfy the requirements for the requested loss-of-use awards." The SHO also found that Walters's reliance on *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364, 857 N.E.2d 1203, was misplaced because that case involved a spinal-cord injury resulting in quadriplegia, not a brain injury that interfered with all bodily functions.

{¶ 12} After the commission refused further administrative review of the claim, Walters filed a mandamus action in the Tenth District. Walters sought a writ directing the commission to vacate the SHO's order and issue a new order granting her request for scheduled-loss compensation. The Tenth District denied the writ, concluding that "where there is only a loss of brain function * * * and no injury to a body part listed in R.C. 4123.57(B), and no other injury to the body, the

commission does not abuse its discretion in failing to award loss of use compensation under R.C. 4123.57." 2022-Ohio-4587, ¶ 22.

{¶ 13} Walters appealed to this court as of right. Additionally, Walters filed a contested motion for oral argument.

## II. ANALYSIS

### A. *Legal Standards*

{¶ 14} Walters is entitled to a writ of mandamus if she shows by clear and convincing evidence that she has a clear legal right to the requested relief, that the commission has a clear legal duty to provide that relief, and that she has no adequate remedy in the ordinary course of the law. *State ex rel. Zarbana Industries, Inc. v. Indus. Comm.*, 166 Ohio St.3d 216, 2021-Ohio-3669, 184 N.E.3d 81, ¶ 10.

{¶ 15} R.C. 4123.512(A) provides claimants and employers the right to appeal a commission's final order to a court of common pleas "in any injury or occupational disease case, other than a decision as to the extent of disability." Appellate review is limited to "decisions involving a claimant's right to participate or to continue to participate" in the workers' compensation fund. *Afrates v. Lorain*, 63 Ohio St.3d 22, 584 N.E.2d 1175 (1992), paragraph one of the syllabus, citing former R.C. 4123.519, renumbered as R.C. 4123.512 in Am.Sub.H.B. No. 107, 145 Ohio Laws, Part II, 2990, 3153 (effective Oct. 20, 1993). Because the commission's decision to grant or deny scheduled-loss compensation in accordance with R.C. 4123.57(B) is a decision "as to the extent of disability," it is not appealable under R.C. 4123.512(A) and must be challenged in a mandamus action. *See State ex rel. Kroger Co. v. Stover*, 31 Ohio St.3d 229, 510 N.E.2d 356 (1987), paragraph one of the syllabus.

{¶ 16} In a direct appeal of the judgment in a mandamus action that originated in a court of appeals, we review the judgment as if the action had been originally filed in this court. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 164, 228 N.E.2d 631 (1967). A writ of mandamus may lie when there is a

legal basis to compel the commission to perform its legal duties under the law or when the commission has abused its discretion in carrying out its duties. *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 117 Ohio St.3d 480, 2008-Ohio-1593, 884 N.E.2d 1075, ¶ 9. "Where a commission order is adequately explained and based on some evidence, even evidence that may be persuasively contradicted by other evidence of record, the order will not be disturbed as manifesting an abuse of discretion." *State ex rel. Mobley v. Indus. Comm.*, 78 Ohio St.3d 579, 584, 679 N.E.2d 300 (1997). But "[a] mandatory writ may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law." *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65, 322 N.E.2d 660 (1975).

{¶ 17} R.C. 4123.57 governs partial-disability compensation. R.C. 4123.57(B) sets forth a schedule for the payment of compensation at the statewide average weekly wage for the loss of enumerated body parts. For the loss of an arm, the claimant would receive 225 weeks of compensation, and for the loss of a leg, the claimant would receive 200 weeks of compensation. *Id.* Loss of sight and loss of hearing are also compensable, as follows:

> For the loss of the sight of an eye, one hundred twenty-five weeks.
>
> For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.

For the permanent and total loss of hearing of one ear, twenty-five weeks; but in no case shall an award of compensation be made for less than permanent and total loss of hearing of one ear.

For the permanent and total loss of hearing, one hundred twenty-five weeks; but, except pursuant to the next preceding paragraph, in no case shall an award of compensation be made for less than permanent and total loss of hearing.

*Id.*

### B.  Loss of Sight and Loss of Hearing

*1.*  State ex rel. Smith v. Indus. Comm.

{¶ 18} The parties' primary disagreement centers on the application of this court's holding in *Smith* to this case.  Smith suffered anoxic brain damage as a result of surgical complications following a work-related injury, leaving him in a persistent vegetative state.  He was awarded compensation on the allowed condition of anoxic brain injury, but his claim was amended to include requests for compensation for loss of sight and hearing.  The commission denied the requests for additional compensation.  The medical evidence did not show any injury to Smith's eyes or ears, and his inability to respond to visual stimuli or auditory communications due to his vegetative state precluded definitive testing of his vision and hearing.  We held that "R.C. 4123.57(B) does not * * * provide for compensation for a loss of brain-stem functioning that precludes the claimant from processing and understanding the visual and auditory stimuli that are received by functioning eyes and ears." *Smith*, 138 Ohio St.3d 312, 2014-Ohio-513, 6 N.E.3d 1142, at ¶ 13.  We therefore upheld the commission's decision denying the additional requests for compensation because the evidence showed that Smith had suffered a loss of brain-stem functioning; it did not support a finding that Smith's eyes and ears no longer functioned.  *Id.* at ¶ 18-19.

**{¶ 19}** Despite the reference to "brain-stem" function in *Smith*, *see id.* at ¶ 2, 11-16, 19, the requests for additional compensation in that case were based on the contention that Smith suffered from a lack of cerebral-cortical functioning, not a loss of brain-stem functioning.[2]  Regardless of whether Smith suffered a loss of brain-stem function or cerebral-cortex function, our conclusion that the medical evidence did not support a finding that Smith's eyes and ears no longer functioned remains unchanged.

**{¶ 20}** For purposes of our decision in this case, we consider that decedent suffered a brain injury and loss of brain function rather than a brain-*stem* injury and loss of brain-*stem* function.

### 2.  Burden of Proof

**{¶ 21}** In her first proposition of law, Walters misstates the evidentiary burden in this claim.  Her first proposition of law states, "In the *absence* of evidence that the eyes and ears still function, R.C. 4123.57 mandates compensation for loss of the sight of the eyes and for the permanent and total loss of hearing." (Emphasis added.)  It is well settled, however, that the claimant bears the burden to affirmatively demonstrate with medical evidence the loss at issue under R.C. 4123.57(B).  *See, e.g.*, *State ex rel. Varney v. Indus. Comm.*, 143 Ohio St.3d 181, 2014-Ohio-5510, 36 N.E.3d 109, ¶ 16; *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, ¶ 17; *see also* Ohio Adm.Code 4123-3-09(C)(3) ("The burden of proof is upon the claimant (applicant for workers' compensation benefits) to establish each essential element of the claim by preponderance of the evidence").

---

2. The only reference to the brain stem was in a physician's report indicating that " 'no significant relay of the impulses past the brain stem to the visual cortex on either side exist[ed].' " *State ex rel. Smith v. Indus. Comm.*, 197 Ohio App.3d 289, 2012-Ohio-1011, 967 N.E.2d 259 (10th Dist.), ¶ 25, *rev'd*, 138 Ohio St.3d 312, 2014-Ohio-513, 6 N.E.3d 1142.

**{¶ 22}** Moreover, contrary to Walters's position, our holding in *Smith* did not alter the evidentiary burden of the claimant in cases involving claims for scheduled-loss compensation for loss of sight and hearing. In *Smith*, we observed that despite evidence that Smith's optic nerves were intact, no test could definitively establish whether his eyes or ears still functioned, because he was in a vegetative state. *Id.*, 138 Ohio St.3d 312, 2014-Ohio-513, 6 N.E.3d 1142, at ¶ 16-17. We held that the commission properly denied the request for additional compensation in that case, not because there was some evidence of eye and ear function but because there was *no* evidence to support a finding that Smith's eyes and ears did not function, *id*. at ¶ 18-19, as is required for scheduled-loss compensation to be awarded under R.C. 4123.57(B). It is therefore incorrect for Walters to suggest that the commission must award compensation for loss of sight and hearing in the absence of evidence that decedent's eyes and ears still functioned.

*3. Type of Injury versus Type of Loss*

**{¶ 23}** In her second proposition of law, Walters asserts that "[t]he plain language of R.C. 4123.57(B) does not exclude losses that are due to brain injury received in the course of, and arising out of, the injured worker's employment."

**{¶ 24}** The SHO found that an anoxic brain injury "does not satisfy the requirements for the requested loss-of-use awards" and that this court in *Smith* "expressly indicated the General Assembly did not include losses of use from a brain injury in the schedule set forth in [R.C. 4123.57(B)]." Although we at some points in *Smith* contrasted the loss of brain functioning (or brain injury) that causes loss of sight or hearing with having an actual injury to an eye or ear, *see Smith* at ¶ 15-17, we held that the General Assembly did not include a loss of brain function in the R.C. 4123.57(B) schedule for payment of compensation and that the evidence did not support a finding that Smith's eyes and ears no longer functioned, *Smith* at ¶ 18-19.

{¶ 25} In this case, the Tenth District concluded that "R.C. 4123.57(B) does not authorize loss of use compensation when a loss of brain function is the cause of the vision or hearing loss rather than damage to the eye or ear structure itself." 2022-Ohio-4587 at ¶ 12, citing *State ex rel. Harris v. Indus. Comm.*, 10th Dist. Franklin No. 21AP-60, 2022-Ohio-3149, ¶ 7, *aff'd on other grounds*, __ Ohio St.3d __, 2023-Ohio-3081, __ N.E.3d __, and *State ex rel. Dobson v. Indus. Comm.*, 10th Dist. Franklin No. 21AP-83, 2022-Ohio-3796, ¶ 5. Walters argues that by requiring decedent to have suffered an injury to the eyes and ears to substantiate an award of compensation for loss of sight and hearing, respectively, the Tenth District has modified the plain language of R.C. 4123.57(B), which does not precondition a loss-of-use award on a finding of direct trauma to the affected body part.

{¶ 26} The Tenth District and the commission seem to have relied on the following paragraph in *Smith*:

> R.C. 4123.57 authorizes compensation for loss of sight when the claimant shows an actual loss of vision as [a] result of injury to the eye and for loss of hearing occasioned by injury to the ear. At the present time, this statute does not authorize compensation for the loss of brain-stem functioning.

138 Ohio St.3d 312, 2014-Ohio-513, 6 N.E.3d 1142, at ¶ 15. However, the key question in *Smith* was whether the medical evidence demonstrated that Smith's eyes and ears no longer functioned. *See id.* at ¶ 16. In *Smith*, the medical evidence included a physician's opinion that Smith could not process visual stimuli because " 'no significant relay of the impulses past the brain stem to the visual cortex on either side exist[ed],' " (emphasis deleted) *id.*, and the physician " '[did] not believe' " Smith could hear " 'because of loss of efferent pathways from the mid brain and auditory nerve to the auditory cortex bilaterally in the posterior superior

temporal lobes,' " (brackets sic and emphasis deleted) *id*. at ¶ 17. The fact that there was no evidence of an eye or ear injury was significant because Smith's brain injury precluded definitive visual and auditory testing. *See id*. at ¶ 18. We denied the writ in that case because there was no evidence to support a finding that Smith's eyes and ears no longer functioned; the *only* loss established by the medical evidence was a loss of brain function. *Id*. at ¶ 18-19. In other words, the medical evidence demonstrated Smith's lack of ability *to respond* to visual stimuli or auditory communications but not a lack of sight or hearing.

{¶ 27} The crux of our holding in *Smith* is that in the absence of injury to the eyes and ears, evidence of a brain injury that precludes definitive visual and auditory testing is insufficient to support a finding that the eyes and ears no longer function and, therefore, will not support an award for loss of sight and hearing under R.C. 4123.57(B). *See id*. at ¶ 2 ("Because of [Smith's] condition, no test can be performed to determine whether he has suffered an actual loss of sight in one or both eyes or an actual loss of hearing in one or both ears, *and* the medical evidence shows that Smith is unable to process sights and sounds because of damage to his brain, not because of any injury to his eyes or ears" [emphasis added]). The burden remains on the claimant to prove the requisite loss of sight and hearing to support an award of scheduled-loss compensation under R.C. 4123.57(B), and in *Smith*, we determined that the claimant had not met that burden.

{¶ 28} Here, the SHO found that "[t]he medical evidence does not substantiate" an award for loss of sight or hearing. Walters challenges this finding by arguing that Dr. Epstein's and Dr. Merkler's reports are persuasive evidence that the anoxic brain injury destroyed decedent's visual and auditory pathways independent of any injury to the brain stem. Dr. Epstein opined that decedent's prolonged period of anoxia damaged the nerve cells composing decedent's visual and auditory pathways, which are derived directly from the brain. This evidence resembles that in *Smith*, which also included a medical opinion that the injured

worker could not process visual stimuli because there was " 'no significant relay of the impulses past the brain stem to the visual cortex,' " (emphasis deleted) *Smith* at ¶ 16. And in this case, Dr. Merkler opined that decedent's hypoxic-ischemic injury damaged areas of decedent's cerebrum prior to any injury to the brain stem and that decedent was never "brain dead." However, as discussed above, whether decedent suffered damage to the cerebrum or to the brain stem is not determinative of Walters's claim.

**{¶ 29}** The medical evidence in this case demonstrates, just as it did in *Smith*, that decedent was unresponsive to visual stimuli and auditory communications—thus precluding the medical providers from performing definitive visual and auditory testing—and that decedent did not suffer any injury to his eyes or ears. Accordingly, we conclude that there is some evidence to support the commission's conclusion that an award for the loss of sight in both eyes and the permanent and total loss of hearing in both ears was not substantiated. We uphold the commission's denial of compensation for loss of sight and hearing.

### C. Loss of Use of the Arms and Legs

#### 1. Standard of Proof

**{¶ 30}** Walters asserts in her third proposition of law that "*Smith* does not preclude a loss of use award for arms and legs." In the alternative, she contends in her fourth proposition of law that "*Smith* should be overruled on the ground that it was wrongly decided, defies practical workability, and [because] overruling it would not create an undue hardship for those who have relied upon it."

**{¶ 31}** *Smith*'s basic premise seemingly applies to any alleged loss under R.C. 4123.57(B)—namely, in the absence of an injury to the affected body part, evidence of a brain injury that precludes definitive testing of the alleged loss is insufficient to support a finding that the affected body part no longer functions. However, the standard for *proving* the requisite degree of loss of a body part differs from the specific statutory standards applicable to loss of sight and loss of hearing.

**{¶ 32}** For loss of sight, "in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision." R.C. 4123.57(B). The statute also precludes compensation for a partial loss of hearing: "[I]n no case shall an award of compensation be made for less than permanent and total loss of hearing," *id.*; *see also State ex rel. Hammond v. Indus. Comm.*, 64 Ohio St.2d 237, 241, 416 N.E.2d 601 (1980) ("Regarding an injury related to hearing, as with sight, the General Assembly has specified in [R.C. 4123.57(B)] a threshold injury level, below which no compensation will be allowed" [footnote omitted]); *State ex rel. Dingess v. Indus. Comm.*, 82 Ohio St.3d 31, 34, 693 N.E.2d 784 (1998) ("R.C. 4123.57(B) expressly limits compensation to those suffering a permanent and total hearing loss"). *Compare State ex rel. Sheller-Globe Corp. v. Indus. Comm.*, 66 Ohio St.2d 51, 52, 419 N.E.2d 1084 (1981) (commission did not abuse its discretion in awarding benefits for loss of hearing based on medical opinion that the claimant "ha[d] a very minimal level of hearing" yet suffered "permanent and total hearing loss in both ears").

**{¶ 33}** For loss of a limb, we have held that under R.C. 4123.57(B), the "loss" of a body part includes amputation or severance as well as "loss of use" that is both permanent and total, to the same effect and extent as if the limb had been physically removed. *State ex rel. Walker v. Indus. Comm.*, 58 Ohio St.2d 402, 390 N.E.2d 1190 (1979). A claimant must demonstrate with medical evidence a total loss of use of the body part at issue "for all practical intents and purposes." *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, 810 N.E.2d 946, ¶ 12. In *Alcoa*, the claimant suffered an industrial injury to his left hand and arm that resulted in amputation of his left arm just above the elbow. *Id.* at ¶ 1. We affirmed the Tenth District's judgment upholding the commission's award under R.C. 4123.57(B) for the claimant's loss of the left arm based on evidence that the claimant was unable to use that arm with a prosthesis. *Id.* at ¶ 3-4, 16-17. And in *Moorehead*, the medical evidence established that before the

16

claimant died from his industrial injury, he suffered "the physical loss of use of his limbs" due to quadriplegia resulting from a spinal injury caused by his workplace fall. *Id.*, 112 Ohio St.3d 27, 2006-Ohio-6364, 857 N.E.2d 1203, at ¶ 20. We issued a writ returning the matter to the commission to determine the amount of scheduled-loss benefits payable under R.C. 4123.57(B) for the claimant's loss of both arms and legs. *Moorehead* at ¶ 21-22.

{¶ 34} This case appears to be the first instance in which the Tenth District has denied compensation under R.C. 4123.57(B) for any loss other than loss of sight or hearing by applying our holding in *Smith*. And in at least one instance the commission has expressly declined to apply *Smith* to a request for compensation for the loss of use of arms and legs. *See State ex rel. Heilman v. Indus. Comm.*, 10th Dist. Franklin No. 21AP-353, 2023-Ohio-3073, ¶ 52. However, we need not resolve in this case the extent to which *Smith*, a case involving a claim for compensation under R.C. 4123.57(B) for loss of sight and hearing, applies to a claim for compensation under the same statute for loss of use of the limbs. That is because even apart from our holding in *Smith*, there is some evidence in this case to support the SHO's finding that an award of compensation for decedent's loss of use of his arms and legs was not substantiated, and the cases on which Walters relies to support her loss-of-limbs claim are distinguishable from this case. Accordingly, we also do not address Walters's alternative argument that *Smith* should be overruled.

*2. "Some Evidence" Supports the Commission's Decision*

{¶ 35} Challenging the SHO's finding that an award of compensation for decedent's loss of use of his arms and legs was not substantiated, Walters points to three cases in which we upheld awards of compensation despite the lack of direct trauma to the claimant's arms or legs.

{¶ 36} In *Gassmann* and *Walker*, the claimants each suffered an industrial injury resulting in paralysis from the waist down. *Gassmann*, 41 Ohio St.2d at 64,

322 N.E.2d 660; *Walker* 58 Ohio St.2d at 402, 390 N.E.2d 1190. We held that the claimants were entitled to compensation because for all practical purposes, the claimants had lost their legs to the same effect and extent as if their legs had been amputated or otherwise physically removed. *Gassmann* at 67 (pertaining to an award of permanent-total-disability compensation); *Walker* at 403-404, citing *Gassmann* at 67 (pertaining to an award of scheduled-loss compensation).

{¶ 37} In *Moorehead*, the injured worker suffered a medically documented spinal-cord injury that rendered him a quadriplegic; he never regained consciousness and died 90 minutes later. *Id.*, 112 Ohio St.3d 27, 2006-Ohio-6364, 857 N.E.2d 1203, at ¶ 1. The injured worker's widow presented medical evidence establishing that he had sustained the physical loss of use of his limbs prior to his death as a result of the industrial injury. *Id.* at ¶ 20. We granted a writ, ordering the commission to award scheduled-loss compensation for the injured worker's loss of his arms and legs. *Id.*

{¶ 38} *Gassman*, *Walker*, and *Moorhead* are distinguishable from this case. Here, decedent did not sustain a spinal-cord injury. Hospital records indicate decedent was unconscious and intubated at the scene of the accident, that he remained comatose until his death and was thus unable to participate in motor and coordination examinations of his extremities, and that he did not suffer any injuries to his arms or legs. And although Dr. Blecker opined that decedent was "certainly left without function of his arms and legs * * * until the time of his death," he did not indicate whether that loss of function would have been permanent if decedent had survived. In that vein, although Dr. Lieser opined that decedent had suffered "irreversible cessation" of brain function, he also opined that "[t]he objective evidence supports that, *had* [decedent] recovered from his anoxic brain injury, he would have retained the ability to use the arms and legs." (Emphasis added.) *See, e.g.*, *State ex rel. Koepf v. Indus. Comm.*, 10th Dist. Franklin No. 18AP-753, 2019-Ohio-3789, ¶ 11 (the Tenth District has "repeatedly looked to whether the evidence

supports that, but for the decedent's death, there was a loss of use that would have been permanent"), citing *State ex rel. Sagraves v. Indus. Comm.*, 10th Dist. Franklin No. 10AP-1030, 2012-Ohio-1010, ¶ 9, and *State ex rel. Carter v. Indus. Comm.*, 10th Dist. Franklin Nos. 09AP-30 and 09AP-71, 2009-Ohio-5547, ¶ 5.

{¶ 39} Accordingly, we uphold the commission's decision denying Walters's request for compensation under R.C. 4123.57(B) for the loss of use of both arms and legs by decedent prior to his death, because some evidence supports the commission's decision.

### D. Motion for Oral Argument

{¶ 40} Whether to grant a request for oral argument in a direct appeal is subject to this court's discretion. S.Ct.Prac.R. 17.02(A). In exercising that discretion, we consider whether the case involves (1) a matter of great public importance, (2) complex issues of law or fact, (3) a substantial constitutional issue, or (4) a conflict among courts of appeals. *State ex rel. Davis. v. Pub. Emps. Retirement Bd.*, 111 Ohio St.3d 118, 2006-Ohio-5339, 855 N.E.2d 444, ¶ 15.

{¶ 41} Walters contends that oral argument should be scheduled in this case because it involves a matter of great public importance. She maintains that the Tenth District's application of *Smith* in this case "marks a significant change in the law." However, with our decision today we explain that there has been no significant change in the law: the burden of proof remains with the claimant and *Smith* narrowly holds that loss of brain function is not compensable under R.C. 4123.57(B) and that evidence of a brain injury that precludes definitive testing of sight or hearing capabilities is insufficient to establish the requisite loss of sight or hearing under that statute. We therefore deny Walters's motion for oral argument.

### III. CONCLUSION

{¶ 42} We conclude that there is some evidence in the record to support the commission's denial of Walters's application for scheduled-loss compensation under R.C. 4123.57(B) for loss of sight in both eyes and loss of hearing in both ears

by decedent prior to his death. Additionally, we conclude that there is some evidence in the record to support the commission's denial of compensation to Walters for loss of use of both arms and legs by decedent. Accordingly, Walters has not demonstrated that she has a clear legal right to the requested relief, and she is therefore not entitled to mandamus relief. We deny Walters's motion for oral argument, and we affirm the Tenth District's judgment denying the writ.

Judgment affirmed.

KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, BRUNNER, and DETERS, JJ., concur.

_____

Philip J. Gauer, Attorney at Law, L.L.C., and Philip J. Gauer; and Abramson & O'Connell, L.L.C., Lawrence D. Abramson, and Thomas J. O'Connell, for appellant.

Dave Yost, Attorney General, and Cindy Albrecht, Assistant Attorney General, for appellee Industrial Commission of Ohio.

Critchfield, Critchfield & Johnston, Ltd., Kimberly L. Hall, and Shannon E. Kreuer, for appellee Paradise Lawn Care, Inc.

The Law Offices of Charles W. Kranstuber, L.P.A., and Carley R. Kranstuber; and Flowers & Grube, Melissa A. Ghrist, Paul W. Flowers, and Louis E. Grube, for amicus curiae, Ohio Association for Justice.

_____